## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JANE DOE 1, and JANE DOE 2, | JURY TRIAL DEMANDED |
| Plaintiffs, | Civ. No. _____ |
| v. | |
| DARDEN RESTAURANTS, INC., GMRI, INC. d/b/a LONGHORN STEAKHOUSE, and KYLE DRAKE, | |
| Defendants. | |

## **COMPLAINT**

Plaintiffs, Jane Doe 1 and Jane Doe 2, by and through their counsel, Mobilio Wood, file the instant Complaint against Defendants, Darden Restaurants, Inc., GMRI, Inc. d/b/a Longhorn Steakhouse, and Kyle Drake, averring in support thereof as follows:

## **Introduction**

1.      Plaintiffs are former employees of a Longhorn Steakhouse restaurant owned and operated by Defendants, Darden Restaurants, Inc. and GMRI, Inc.

2.      Plaintiffs bring this action after being subjected to a lengthy and escalating pattern of *quid pro quo* sexual advances, and sexual assaults, at the

hands of the restaurant's Managing Partner, Defendant Kyle Drake, and being terminated when they eventually rejected his abusive behavior.

3.    Defendant Drake's harassment of Plaintiffs was severe and pervasive, and consisted of, among other things, inappropriately groping Plaintiffs; making verbal sexual advances towards Plaintiffs; repeatedly sending sexually explicit photos and videos of himself to Plaintiffs via text message and social media applications; compelling Plaintiffs to drink alcohol with him on-the-clock and in the workplace; and, most egregiously, ***sexually assaulting one of the Plaintiffs in his office on the Restaurant's premises – not once, but twice***.

4.    When Plaintiffs accepted Defendant Drake's advances, they received job promotions, pay raises, and were staffed to more lucrative shifts and more desirable sections of the restaurant.

5.    However, Defendant Drake's harassment took a toll on both Plaintiffs' emotional well-being, and both were required to seek psychological treatment and were prescribed psychiatric medication throughout the course of their employment.

6.    Both Plaintiffs therefore eventually grew less receptive to Defendant Drake's advances, and in response were staffed to lower paying and less desirable shifts, were verbally accosted, and were ultimately terminated after years of employment at the restaurant.

7.     While federal law is clear that a company is strictly liable for a supervisor's sexual harassment when, as here, the harassment culminates in tangible employment action, Defendant Darden at all times either was aware of or should have been aware of Defendant Drake's misconduct, but repeatedly failed to act.

8.     Specifically, Defendant Drake engaged in sexually harassing conduct, identical to the harassment directed at Plaintiffs, towards numerous female subordinate employees at the restaurant, and since at least as early as 2016, no less than three complaints were filed with Defendant Darden concerning Defendant Drake's mistreatment of female employees – two of which explicitly alleged sexual harassment.

9.     However, Defendant Darden outright ignored at least one of the complaints, and with respect to the complaint it did respond to, it tasked Defendant Drake's personal friend, Director of Operations Todd LeFever, with "investigating" the allegations.

10.    LeFever then compromised the integrity of the resulting investigation by giving Defendant Drake advance notice of the investigation – which enabled Defendant Drake to contact and intimidate witnesses prior to them being interviewed by LeFever – and by improperly pressuring the employee responsible for lodging the complaint.

3

11.    Defendant Drake unsurprisingly escaped discipline for his behavior, and continued his pattern of harassment towards Plaintiffs, causing serious and permanent harm to both Plaintiffs, as further described herein.

### Parties

12.    Plaintiff Jane Doe 1 ("Plaintiff 1") is an adult individual and citizen of the Commonwealth of Pennsylvania.  Plaintiff 1 intends to file a motion to proceed under a pseudonym in this action after seeking concurrence from opposing counsel of record.

13.    Plaintiff Jane Doe 2 ("Plaintiff 2") is an adult individual and citizen of the Commonwealth of Pennsylvania.  Plaintiff 2 intends to file a motion to proceed under a pseudonym in this action after seeking concurrence from opposing counsel of record.

14.    Defendant Darden Restaurants, Inc. is a full-service restaurant company that owns and operates restaurants through subsidiaries across the United States, and transacted business in the Commonwealth of Pennsylvania, including this judicial district, at all times relevant and material hereto.

15.    Defendant GMRI, Inc. d/b/a Longhorn Steakhouse is a wholly owned subsidiary of Defendant Darden Restaurants, Inc., and owned and/or operated a Longhorn Steakhouse restaurant located at 25 Bear Creek Blvd., Wilkes-Barre

Township, Pennsylvania 18702 (the "Restaurant") at all times relevant and material hereto.

16.     Plaintiffs shall hereinafter collectively refer to Defendants Darden Restaurants, Inc. and GMRI, Inc. d/b/a Longhorn Steakhouse as "Defendant Darden" or the "Company."

17.     At all times relevant and material herein, Defendant Darden acted by and through its ostensible and/or actual agents, servants, workmen and/or employees.

18.     Defendant Kyle Drake ("Drake") is an adult individual and served as Managing Partner of the Restaurant at all times relevant and material hereto.

**<u>Jurisdiction and Venue</u>**

19.     This Court has jurisdiction over Plaintiffs' federal claims in accordance with 28 U.S.C. § 1331 because this civil action arises under a law of the United States and seeks redress for violations of a federal law.  This Court has jurisdiction over Plaintiffs' state law claims because they are supplemental to Plaintiffs' underlying federal claims and derive from a common nucleus of operative facts pursuant to 28 U.S.C. § 1367.

20.     This Court may properly maintain personal jurisdiction over Defendants because Defendants' contacts with this Commonwealth and this

judicial district are sufficient for the exercise of jurisdiction over Defendants to comply with traditional notions of fair play and substantial justice.

21.     Venue is properly laid in this judicial district pursuant to 28 U.S.C. § 1391, as a substantial part of the acts or omissions giving rise to the claims alleged herein occurred within this judicial district, and Defendants are subject to personal jurisdiction in this district.

### Exhaustion of Administrative Remedies

22.     On June 11, 2019, Plaintiff 1 dual-filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and Pennsylvania Human Relations Commission ("PHRC") against Defendants, alleging that Defendant Darden unlawfully discriminated against her on the basis of her sex, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and the Pennsylvania Human Relations Act, as amended, 43 P.S. § 951 *et seq.* ("PHRA"), and that Defendant Drake aided and abetted Defendant Darden's discriminatory conduct, in violation of the PHRA.

23.     On August 1, 2019, Plaintiff 2 dual-filed a Charge of Discrimination with the EEOC and PHRC against Defendants, alleging that Defendant Darden unlawfully discriminated against her on the basis of her sex, in violation of Title VII and the PHRA, and that Defendant Drake aided and abetted Defendant Darden's discriminatory conduct, in violation of the PHRA.

24. Upon Plaintiffs' requests, on March 2, 2020, the EEOC issued a

Notice of Right to Sue to Plaintiff 1 and Plaintiff 2.[1]

## **Factual Allegations**

**A.  Defendant Drake's Prominent Position and Longstanding Disregard for Darden's Policies and Procedures**

25. Plaintiff 1 was hired by Defendant Darden as a Server at the

Restaurant in or around January 2014.

26. Plaintiff 2 was hired by Defendant Darden as a Server at the

Restaurant in or around February 2016.

27. At all times relevant and material herein, Plaintiff 1 and Plaintiff 2

were supervised by, and reported to, the Restaurant's Managing Partner, Defendant

Drake.

28. According to a 2019 letter from Defendant Darden to the Company's

shareholders, the role of Managing Partner is "*the most influential role in [the]*

*company.*"

29. At all times relevant and material herein, Defendant Drake possessed

the authority to hire and fire employees, to promote employees, to transfer

---

[1] Plaintiff 1 and Plaintiff 2 intend to file motions for leave to amend the instant Complaint to assert claims for violation of the PHRA against Defendant Darden and Defendant Drake following the expiration of 12 months from the date of dual-filing their respective Charges of Discrimination with the PHRC.

employees, to reassign employees' job responsibilities, and to take other actions affecting the terms and conditions of employees' employment.

30.     Indeed, Defendant Darden's employee handbook provides that "[s]upervisors are responsible for influencing and taking Company personnel actions . . . ."

31.     Defendant Drake is a recipient of Darden's prestigious Diamond Club award, an annual award that recognizes the Company's Managing Partners throughout the country who achieve top financial performance.

32.     Due to Defendant Drake's Diamond Club status and stellar financial accomplishments, Defendant Darden for years allowed him to disregard numerous policies and procedures governing employee conduct at the Restaurant.

33.     Specifically, Defendant Darden's employee handbook provides, at least facially, that:

a)     "Supervisors . . . must not engage in gender-based employment discrimination in the form of sexual harassment, or harassment on the basis of any other protected category."

b)     "Retaliation is prohibited."

c)     "Never engage in inappropriate discussions [using social media] about individuals affiliated with the Company or its guests that are racially or sexually harassing [or] contain sexually explicit content . . . ."

8

d) "The following acts are examples of conduct that violates th[e] alcohol/substance abuse policy and may result in disciplinary action up to and including immediate termination: . . . Drinking alcohol during your shift . . . ."

e) "[C]lose personal relationships between an hourly team member and a member of management (such as a manager or Director of Operations) are strictly prohibited. This includes close friendships as well as romantic relationships."

f) "Social networking over the internet, via cell phones or other kinds of communication devices, may also constitute having a relationship and is subject to [the guidelines governing management/hourly team member relationships]."

g) "It is [hourly employees'] responsibility to ensure that [they] clock in and out appropriately. [Hourly employees] are never permitted to work 'off the clock' for any reason."

34. However, from the outset of and continuing throughout their employment, both Plaintiffs observed and/or were made aware of Defendant Drake boldly and repeatedly violating Darden's policies and procedures with impunity, including but not limited to undertaking the following conduct:

a)      Defendant Drake sent sexually graphic photographs and videos of himself, including photos and videos depicting his penis, via text message and social media applications to numerous female subordinate hourly employees;

b)      Defendant Drake engaged in romantic dating relationships with at least three subordinate hourly female employees;

c)      Defendant Drake purchased jewelry for at least one subordinate hourly female employee who he was engaged in a dating relationship with;

d)      Defendant Drake sent personal, non-work-related text messages and social media messages to subordinate hourly female employees;

e)      Defendant Drake made physical sexual advances towards female subordinate hourly employees;

f)      Defendant Drake made offensive remarks about the physical features of female subordinate hourly employees;

g)      Defendant Drake drank alcohol, and encouraged female subordinate hourly employees to consume alcohol – including homemade moonshine – in his office and while they were on-the-clock;

h)      Defendant Drake invited female subordinate hourly employees to join him at bars and other after-hours events; and

i)      Defendant Drake required that hourly employees roll silverware and perform other work-related tasks while they were off-the-clock.

35.     Plaintiffs observed that female employees who acceded to Defendant Drake's sexual advances received preferential treatment in the form of being staffed to more desirable sections in the Restaurant, being scheduled on more lucrative shifts, and receiving promotions to higher paying positions.

36.     To the contrary, however, Plaintiffs also observed that female employees who rebuffed or complained about Defendant Drake's sexual advances were staffed to less desirable and less lucrative shifts, were transferred to other restaurants, and/or were terminated.

37.     Defendant Drake's flouting of Darden's policies and retaliatory conduct occurred openly and regularly, and was well-known to employees at the Restaurant.

38.     For example, in a group text message exchange amongst several female hourly employees concerning a wage and hour proceeding filed against the Company that implicated Defendant Drake, one employee stated, "***[T]hat's my job [Defendant Drake] will find a reason to get rid of me***," and, "***I recommend if any one [sic] gets calls don't give information unless you don't want your job***." Another female employee added, "I'm not getting involved."

39.     Moreover, at least as early as 2016, a female hourly employee filed a written complaint with Defendant Darden about Defendant Drake's objectification of women and fat-shaming commentary; more specifically, that Defendant Drake

had openly mocked her weight and referred to her as "Aunt Fanny," in reference to an animated movie character with an exaggeratedly large backside.

40.     Notwithstanding the severity of the complaint's allegations, Defendant Darden refused to take appropriate corrective action against Defendant Drake.

**B.     Defendant Drake Uses His Position of Authority to Engage in a Course of Escalating Sexual Advances Towards Plaintiff 1, and Twice Sexually Assaults Her in His Office**

41.     As noted above, Plaintiff 1 was hired as a Server.

42.     Servers at Darden earn approximately $2.83 per hour.

43.     Approximately one year into Plaintiff 1's employment, Defendant Drake began discussing with her the possibility of promoting her to a Service Professional.

44.     Service Professionals at Darden earn approximately $15.00 per hour.

45.     Plaintiff 1 is a single mother of four children, and was highly interested in the promotion given the potential significant raise.

46.     Around the same time, Defendant Drake began making a number of unwanted sexual advances towards Plaintiff 1, including:

a)     Intentionally pressing his body and groin against Plaintiff 1's body;

b)     Slapping Plaintiff 1's buttocks;

12

   c)  Using his finger to trace the decals on the rear pockets of Plaintiff 1's pants; and

   d)  Attaching clothespins from the Restaurant's bar section onto Plaintiff 1's buttocks.

47. Plaintiff 1 observed Defendant Drake exhibit similar behavior towards several of her female colleagues.

48. Defendant Drake also sent numerous text messages containing sexually explicit photographs and videos of himself, including photos and videos depicting his penis, to Plaintiff 1's cell phone.

49. As a single mother faced with the prospect of being promoted to a higher-paying position, and fearing for her job if she rebuffed Defendant Drake, Plaintiff 1 felt compelled to accept Defendant Drake's advances.

50. Plaintiff 1 was promoted to a Service Professional in or around 2015.

51. As a Service Professional, Plaintiff 1 was required to dress in business attire.

52. When Plaintiff 1 was dressed in business attire, Defendant Drake often approached her and unbuttoned the top two buttons of her shirt without her permission.

53. Further, Defendant Drake began sending additional graphic sexual photos and videos of himself to Plaintiff 1 through various social media

applications, including WhatsApp, Snapchat, and Kik – some of which are programmed to automatically delete communications – in an attempt to disguise his tracks.

54.     As his harassment continued, Defendant Drake began discussing with Plaintiff 1 the possibility of promoting her to a Manager.

55.     Along these lines, Defendant Drake reminded Plaintiff 1 via text message, "You should only be worried about you moving up."

56.     On one occasion, Plaintiff 1 was cleaning a table in the Restaurant and had an A.1. steak sauce bottle in her hand, when Defendant Drake approached her, took the bottle out of her hand, put the lid on the bottle, and placed it on the table.

57.     Plaintiff 1 asked Defendant Drake what he was doing, to which he responded, "You know exactly what to do with it," suggesting that Plaintiff 1 should pleasure herself with the bottle.

58.     Defendant Drake often invited Plaintiff 1 to his office to drink alcohol, including homemade moonshine, with him, while he and Plaintiff 1 were on-the-clock.

59.     Unfortunately for Plaintiff 1, as time passed, Defendant Drake's misconduct grew from persistent unwanted harassment to a series of full-blown, traumatic sexual assaults.

60.     One evening, Plaintiff 1 was nearing the end of her shift, prior to the Restaurant closing.

61.     Plaintiff 1 walked into Defendant Drake's office to hand in her server book, as was customary procedure.

62.     When she entered Defendant Drake's office, the heavy office door automatically swung shut behind her.

63.     Defendant Drake approached Plaintiff 1, and after taking her server book out of her hand, motioned for Plaintiff 1 to look down towards his penis.

64.     When Plaintiff 1 looked down, Defendant Drake began to drop his pants and expose his penis.

65.     At this same time, ***Defendant Drake grabbed Plaintiff 1 by her head and hair, pushed her head towards his penis, and forced her to perform oral sex on him***.

66.     Plaintiff 1 was shocked and mortified, but had the courage to pull her head away and break free soon after the assault began.

67.     Plaintiff 1 ran out of Defendant Drake's office with tears in her eyes, where she was observed by a coworker.

68.     The coworker, who Plaintiff 1 had previously arranged to give a ride home from work, observed that Plaintiff 1 was visibly upset, and asked what was wrong.

15

69.     Plaintiff 1 screamed, "Let's just go!"

70.     Plaintiff 1 ran outside to her car, and waited for her coworker to turn in her server book and then join her in the vehicle.

71.     When Plaintiff 1's coworker joined her in the vehicle, Plaintiff 1 broke down in tears and told her coworker about the assault.

72.     Even more appalling, as Plaintiff 1 was hysterical, dealing with the realization that she had just been sexually assaulted in her workplace, Defendant Drake – feeling no guilt for his actions – sent a text message to Plaintiff 1, ordering her to "*come back*," because "*[t]he tip is wet for you*."

73.     Feeling scared, embarrassed, and ashamed, Plaintiff 1 did not return to the Restaurant as demanded by Defendant Drake.

74.     Defendant Drake thereafter sent a text message to Plaintiff 1 expressing his frustration with her failing to return to the restaurant to engage in further sex acts, in which he exclaimed, "*I sat in the back and waited for 5 minutes!*"

75.     When Plaintiff 1 returned to work following the assault, she had no choice but to continue delivering her server book to Defendant Drake's office at the conclusion of each shift.

76.     Several months later, Defendant Drake seized on the Company's lax protocols and *once again sexually assaulted Plaintiff 1 in his office*.

77.     The assault followed a nearly identical pattern to the attack described immediately above.

78.     Plaintiff 1 eventually freed herself, and ran out of the Restaurant to her car, where she again broke down in tears.

**C.      Defendant Drake Similarly Uses His Position of Authority to Engage in a Course of Escalating Sexual Advances Towards Plaintiff 2, and a Complaint is Lodged but Darden Fails to Act**

79.     Like Plaintiff 1, Plaintiff 2 was hired by Darden as a Server, at a rate of approximately $2.83 per hour.

80.     Plaintiff 2 was not interviewed prior to being hired.

81.     When Plaintiff 2 was hired, Defendant Drake advised her that the reason she was not interviewed was because he had viewed her profile pictures on Facebook and determined that an interview was not necessary.

82.     Almost immediately after Plaintiff 2's hire, Defendant Drake began to make unwanted sexual advances toward her, including but not limited to:

a)      Intentionally pressing his body and groin against Plaintiff 2's body;

b)      Slapping Plaintiff 2's buttocks;

c)      Attaching clothespins from the Restaurant's bar section onto Plaintiff 2's buttocks; and

17

d) Rubbing Plaintiff 2's legs under the guise of attempting to reach for objects beneath the kitchen's expo window.

83. Plaintiff 2 observed Defendant Drake exhibit similar behavior towards several of her female colleagues.

84. Soon after Plaintiff 2's hire, Defendant Drake invited Plaintiff 2 and another female Server to attend a gala event at the Mohegan Sun Pocono with him.

85. Plaintiff 2 and her coworker met Defendant Drake prior to the gala, at his request, to drink alcohol with him.

86. Plaintiff 2 and her coworker again joined Defendant Drake after the gala, again at his request, to consume more alcohol with him.

87. At or around the time of the gala event, Defendant Drake began sending text messages to Plaintiff 2 on her cell phone about personal, non-work-related matters.

88. The nature of Defendant Drake's electronic communications quickly turned sexual, as Defendant Drake began sending explicit pictures and videos of himself, including pictures and videos depicting his penis, to Plaintiff 2.

89. Soon thereafter, Plaintiff 2's boyfriend at the time, with whom she shares a child, observed a picture of Defendant Drake's penis on her cell phone.

90.     Plaintiff 2's boyfriend contacted Darden's corporate office to file a complaint about Defendant Drake, but Darden did not follow up with Plaintiff 2 or her boyfriend.

91.     As Defendant Drake's advances continued, he mentioned the possibility of promoting Plaintiff 2 from Server to Service Professional.

92.     As noted above, Service Professionals at Darden earn approximately $15.00 per hour, compared to the approximately $2.83 per hour that Plaintiff 2 was earning as a Server.

93.     Plaintiff 2 expressed interest in the promotion, and was thereafter promoted to Service Professional, despite lacking the necessary prerequisites (*e.g.*, first becoming a Certified Trainer) to hold the position.

94.     Several of Plaintiff 2's colleagues expressed dismay that Plaintiff 2 was awarded the promotion notwithstanding her failure to meet the required criteria.

95.     As a Service Professional, Plaintiff 2 was required to dress in business attire, which resulted in Defendant Drake commenting on Plaintiff 2's "tits" and "ass" on a regular basis.

96.     Defendant Drake also trained Plaintiff 2 to work as a Food Runner, which required Plaintiff 2 to stand at the Restaurant's expo window, where Defendant Drake was stationed, throughout the duration of her shift.

97.     Plaintiff 2 often attempted to ask other employees to swap shifts with her in an attempt to avoid Defendant Drake, but was careful not to offend him.

98.     While Defendant Drake's conduct was unwelcomed by Plaintiff 2, she feared objecting to his conduct because she had witnessed him retaliate against other female employees who rebuffed his advances.

99.     Further, Plaintiff 2 observed that she received preferential treatment in the form of better shifts and selective enforcement of disciplinary rules when she did not object to Defendant Drake's conduct.

100.    For instance, Defendant Drake permitted Plaintiff 2 to smoke cigarettes during her shifts, whereas other employees were issued write-ups by or at the direction of Defendant Drake for engaging in the same conduct.

101.    Defendant Drake often summoned Plaintiff 2 to his office to drink alcohol, including homemade moonshine, with him, while Defendant Drake and Plaintiff 2 were on-the-clock.

102.    In addition, Defendant Drake invited Plaintiff 2 to join him at various bars on several occasions, and brought her as his guest to another annual gala event at the Mohegan Sun Casino during her second year of employment.

103.    On one occasion when Plaintiff 2 agreed to accompany Defendant Drake to a local restaurant to have drinks with him, Defendant Drake repeatedly told Plaintiff 2 that he found her physically attractive.

104.   As Defendant Drake's harassment continued, he began discussing the possibility of promoting Plaintiff 2 to a Manager.

105.   Moreover, just as Defendant Drake had done with Plaintiff 1, Defendant Drake expanded the scope of his sexually explicit electronic communications beyond text messages, and sent Plaintiff 2 graphic pictures and videos of himself through various social media applications, including WhatsApp, Snapchat, and Kik – some of which are programmed to automatically delete communications – in an attempt to disguise his tracks.

106.   For example, immediately after sending Plaintiff 2 a video of his penis via text message, Defendant Drake sent Plaintiff 2 his Snapchat username, stating, "Loopas 701: Snap."

107.   In an attempt to not upset Defendant Drake, Plaintiff 2 sometimes attempted to change the subject when Defendant Drake sent her explicit communications, or simply ignored Defendant Drake's messages and later made excuses for her lack of responsiveness, such as claiming that she had fallen asleep.

108.   On one occasion, Defendant Drake approached Plaintiff 2 while she was in the Restaurant's refrigeration unit and presented her with a cucumber, and suggested that Plaintiff 2 use the phallus-shaped object to pleasure herself in the bathroom.

109.   Plaintiff 2 felt humiliated and exited the cooler without responding.

**D.    Another Sexual Harassment Complaint is Lodged Against Defendant
Drake, and He Directs Both Plaintiffs to Destroy Evidence and Lie
About His Sexual Misconduct**

110.    Plaintiff 1 and Plaintiff 2 were not the only victims of Defendant

Drake's predatory behavior.

111.    As noted herein, Defendant Drake utilized his position of authority to

cause several female subordinate employees to engage in romantic dating

relationships with him; purchased gifts for certain female employees who engaged

in relationships with him; inappropriately groped female employees in the

workplace; sent explicit sexual photographs and videos of himself to numerous

female employees; exhibited preferential treatment towards female employees who

accepted his advances; and retaliated against those who did not.

112.    Further, a number of female employees at the Restaurant often

compared explicit photographs and videos of Defendant Drake that he had sent to

them via text message and/or social media.

113.    On one occasion, Defendant Drake ordered all of the Restaurant's

female Servers to change their hairstyles to pigtails, because he stated that male

customers would find the pigtail hairstyles to be more sexually appealing.

114.    In or around late 2017, as a result of Defendant Drake's ongoing and

open and notorious sexual harassment of numerous employees, a female employee

lodged a sexual harassment complaint against Defendant Drake with Darden's corporate office.

115.    Darden tasked Todd LeFever ("LeFever"), Regional Director of Operations, with spearheading the resulting "investigation" into the complaint's allegations.

116.    Lefever and Defendant Drake are friends, socialize outside of work, and have gone on several hunting and fishing trips together.

117.    Thus, prior to commencing his "investigation," LeFever alerted Defendant Drake that a sexual harassment complaint had been lodged against him, and that he intended to interview certain female employees at the Restaurant.

118.    Armed with inside information concerning the nature and scope of the forthcoming investigation, Defendant Drake quickly attempted to do damage control.

119.    Defendant Drake immediately sent a text message to Plaintiff 2 in which he stated, "***There is some stuff going on.  I have to be extra careful.  I'll explain it next time I see you***."

120.    Defendant Drake then spoke with Plaintiff 2, explained that LeFever would be interviewing her in connection with a sexual harassment probe against him, and instructed her to delete all electronic communications which he had sent to her and to advise LeFever that he had not sexually harassed her.

121. Defendant Drake spoke with Plaintiff 1 around this same time, and gave her identical instructions.

122. Both Plaintiffs were aware of Defendant Drake's and LeFever's friendship, and feared repercussions if they did not adhere to Defendant Drake's directive.

123. Thus, both Plaintiffs denied that Defendant Drake had sexually harassed them when they were interviewed by LeFever.

124. In addition to giving Defendant Drake a "heads up" about the complaint, LeFever further compromised the integrity of the investigation by improperly pressuring the employee responsible for filing the complaint.

125. Specifically, rather than objectively assess the employee's allegations when he interviewed her, LeFever reminded her that Defendant Drake was a top-performing manager who had "won Diamond Club," and then suggested that Defendant Drake was being "framed."

126. Feeling dejected, the employee made no further complaints about Defendant Drake following her one-sided encounter with Lefever.

127. Not surprisingly, Defendant Drake was not disciplined at the conclusion of LeFever's "investigation."

128. The employee who filed the complaint was thereafter transferred to a new restaurant.

**E.     Plaintiff 1 Suffers Severe Emotional Distress and Grows Less Receptive to Defendant Drake's Advances, Triggering a Series of Adverse Employment Actions Ultimately Resulting in Her Termination**

129.   During the course of Plaintiff 1's employment, Defendant Drake's harassment caused her to suffer anxiety and other emotional distress so severe that she was required to seek psychological treatment.

130.   In addition, Plaintiff 1 was prescribed an antidepressant medication, the dosage of which was increased by her physician on three separate occasions.

131.   Plaintiff 1 was also prescribed blood pressure medication to treat the symptoms of high blood pressure.

132.   Plaintiff 1 therefore eventually grew less receptive to Defendant Drake's advances.

133.   In response and soon thereafter, Defendant Drake engaged in a pattern of retaliatory conduct towards Plaintiff 1.

134.   Among other things, Defendant Drake:

a)     Stopped acknowledging Plaintiff 1 and gave her the "cold shoulder";

b)     Took away Plaintiff 1's weekend shifts (generally the highest-paying shifts);

c)     Staffed Plaintiff 1 as a Server rather than a Service Professional (the latter position being the higher-paying position);

d)  Sent Plaintiff 1 to work at Darden's Bartonsville, Pennsylvania restaurant (more than 50 miles from Plaintiff 1's home); and

e)  Ceased all discussions with Plaintiff 1 of a management-level promotion.

135.  Defendant Drake also suddenly began addressing Plaintiff 1 as "nubby," in reference to a finger that Plaintiff 1 had amputated following an automobile accident several years earlier, and stated that Plaintiff 1's finger "freak[ed] [him] out."

136.  Similarly, Defendant Drake began referring to Plaintiff 1 as an offensive homophone of her last name.

137.  These retaliatory actions continued until late-April 2019, when Defendant Drake suspended Plaintiff 1 and thereafter terminated her employment under the pretext that she had smoked a vape pen in the Restaurant's freezer, despite the fact that one of Plaintiff 1's coworkers had admitted to committing the infraction.

138.  Not satisfied with merely terminating Plaintiff 1, Defendant Drake continued his vindictiveness upon learning that she had applied for unemployment compensation benefits.

139.  Specifically, Defendant Drake submitted an opposition to Plaintiff 1's application for unemployment compensation benefits, but withheld a witness

statement authored by Plaintiff 1's coworker purporting to absolve Plaintiff 1 of wrongdoing for the incident in question.

140.   Plaintiff 1 only learned of the witness statement because the employee who had authored the statement sent Plaintiff 1 a photograph of the statement.

141.   Despite Defendant Drake's best efforts, Plaintiff 1 was awarded unemployment compensation benefits.

**F.     Plaintiff 2 Suffers Severe Emotional Distress and Grows Less Receptive to Defendant Drake's Advances, Triggering a Series of Adverse Employment Actions Ultimately Resulting in Her Termination**

142.   During the course of Plaintiff 2's employment, Defendant Drake's harassment caused her to suffer anxiety, panic, and other emotional distress so severe that she too was required to seek psychological treatment.

143.   In fact, Plaintiff 2 suffered numerous panic attacks in the workplace, and on at least two occasions, she was required to leave work in the middle of her shift due to the severity of her panic attacks.

144.   Further, Plaintiff 2 was prescribed several antidepressant and anti-anxiety medications to treat her symptoms.

145.   Plaintiff 2 therefore grew less receptive to Defendant Drake's sexual advances.

146.   As a result, Defendant Drake engaged in a pattern of retaliatory conduct towards Plaintiff 2.

27

147.    Among other things, Defendant Drake:

a)    Stopped acknowledging Plaintiff 2 and gave her the "cold shoulder";

b)    Took away Plaintiff 2's weekend shifts (generally the highest-paying shifts);

c)    Staffed Plaintiff 2 as a Server rather than a Service Professional (the latter position being the higher-paying position);

d)    Became verbally aggressive towards Plaintiff 2; and

e)    Ceased all discussions with Plaintiff 1 of a management-level promotion.

148.    When Plaintiff 2 complained to Drake about his retaliatory actions, he responded, "If you don't want to be here, then don't fucking be here."

149.    Defendant Drake also began unduly scrutinizing Plaintiff 2's work performance, and even questioned certain medical-related job absences.

150.    For example, in early-April 2019, Plaintiff 2 was injured in an automobile accident, which necessitated her taking two weeks off from work.

151.    Plaintiff 2 submitted documentation from her physician confirming the necessity of the need for medical leave, but Defendant Drake accused her of lying about the accident, and demanded that she show him a photograph of her totaled vehicle to prove that she had been injured in an automobile accident.

152.   Soon thereafter, Plaintiff 2 was abruptly terminated in response to requesting a day off from work to care for her son due to an unexpected change in her child custody schedule.

153.   Defendant Darden's employee handbook provides that "[f]requent absences . . . may result in disciplinary action," but leaves wide latitude for management to determine the number of absences that warrant discipline as well as the severity of the resulting discipline.

154.   Throughout Plaintiff 2's employment, many of her similarly situated coworkers called off from work frequently, sometimes without even calling to give notice (i.e., a "no-call, no-show" absence), but were not terminated.

## COUNT I

### VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964: HOSTILE WORK ENVIRONMENT SEXUAL HARASSMENT (Plaintiff 1 v. Defendant Darden)

155.   Plaintiff 1 hereby incorporates the preceding paragraphs by reference as though fully set forth at length herein.

156.   Plaintiff 1 was an "employee" as defined by 42 U.S.C. § 2000e(f).

157.   Defendant Darden was Plaintiff 1's "employer" within the meaning of 42 U.S.C. §2000e(b), and employed more than 500 persons.

158.   Title VII provides that it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his

compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(1).

159. At all times relevant and material herein, Defendant Drake was employed as the Managing Partner of the Restaurant and served as Plaintiff 1's supervisor.

160. At all times relevant and material herein, Defendant Drake possessed the authority to take tangible employment action against Plaintiff 1, including hiring, firing, promoting, transferring, and reassigning job responsibilities.

161. Indeed, Darden characterizes its Managing Partner role as "the most influential role in [the] company," and Darden's employee handbook provides that "[s]upervisors are responsible for influencing and taking Company personnel actions . . . ."

162. Throughout the course of Plaintiff 1's employment, she was subjected to unwelcomed harassment by Defendant Drake due to her sex.

163. Defendant Drake's harassment of Plaintiff 1 was severe and pervasive.

164. Defendant Drake's harassment detrimentally affected Plaintiff 1, and would have detrimentally affected a similarly situated reasonable person.

165. Defendant Darden failed to enforce the most basic prohibitions in its own employee handbook seemingly meant to curtail coercive supervisor/employee

relationships, including prohibitions against supervisors maintaining friendships with employees, supervisors socializing with employees outside of work, supervisors sending text messages and social media messages to employees, and supervisors drinking alcohol with employees while on-the-clock.

166.   Defendant Drake's harassment of Plaintiff 1 and other female subordinate employees at the restaurant was open and notorious, such that Defendant Darden either was aware or should have been aware of the harassment.

167.   Defendant Darden was explicitly alerted to Defendant Drake's harassment of a female employee in 2016, but failed to appropriately address the complaint.

168.   Defendant Drake was again alerted to Defendant Drake's sexual harassment in or around 2016 via Plaintiff 2's boyfriend's complaint, but ignored the complaint.

169.   Defendant Darden was once again alerted to Defendant Drake's sexual harassment of numerous female employees in 2017, and not only failed to adequately respond to the complaint, but actively sabotaged the resulting investigation, including through providing Defendant Drake with advance notice of the investigation, and by improperly pressuring at least one witness who attested to Defendant Drake's sexual misconduct.

170.   Defendant Drake's harassment of Plaintiff 1 culminated in several tangible adverse employment actions, most notably her termination.

171.   Because Defendant Drake's harassment of Plaintiff 1 culminated in tangible adverse employment actions, Defendant Darden is strictly liable for Defendant Drake's conduct.

172.   In the alternative, Defendant Darden failed to take reasonable steps to prevent harassment in the workplace, as well to ensure that an adequate complaint-reporting system existed, rendering the Company liable for Defendant Drake's conduct.

173.   In the alternative, Defendant Darden was negligent in controlling the working environment that led to Plaintiff 1's harassment, rendering the Company liable for Defendant Drake's conduct.

174.   Through its conduct, Defendant Darden violated Title VII.

175.   Defendant Darden acted with reckless indifference to Plaintiff 1's rights under federal law, warranting an award of punitive damages.

176.   As a result of Defendant Darden's conduct, Plaintiff 1 has suffered, and continues to suffer, emotional distress, humiliation, embarrassment, anguish, personal hardship, career and social disruption, psychological and emotional harm, and lost wages.

## COUNT II

### VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964: HOSTILE WORK ENVIRONMENT SEXUAL HARASSMENT (Plaintiff 2 v. Defendant Darden)

177.  Plaintiff 2 hereby incorporates the preceding paragraphs by reference as though fully set forth at length herein.

178.  Plaintiff 2 was an "employee" as defined by 42 U.S.C. § 2000e(f).

179.  Defendant Darden was Plaintiff 2's "employer" within the meaning of 42 U.S.C. §2000e(b), and employed more than 500 persons.

180.  Title VII provides that it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(1).

181.  At all times relevant and material herein, Defendant Drake was employed as the Managing Partner of the Restaurant and served as Plaintiff 2's supervisor.

182.  At all times relevant and material herein, Defendant Drake possessed the authority to take tangible employment action against Plaintiff 2, including hiring, firing, promoting, transferring, and reassigning job responsibilities.

183.  Indeed, Darden characterizes its Managing Partner role as "the most influential role in [the] company," and Darden's employee handbook provides that

"[s]upervisors are responsible for influencing and taking Company personnel actions . . . ."

184.   Throughout the course of Plaintiff 2's employment, she was subjected to unwelcomed harassment by Defendant Drake due to her sex.

185.   Defendant Drake's harassment of Plaintiff 2 was severe and pervasive.

186.   Defendant Drake's harassment detrimentally affected Plaintiff 2, and would have detrimentally affected a similarly situated reasonable person.

187.   Defendant Darden failed to enforce the most basic prohibitions in its own employee handbook seemingly meant to curtail coercive supervisor/employee relationships, including prohibitions against supervisors maintaining friendships with employees, supervisors socializing with employees outside of work, supervisors sending text messages and social media messages to employees, and supervisors drinking alcohol with employees while on-the-clock.

188.   Defendant Drake's harassment of Plaintiff 2 and other female subordinate employees at the restaurant was open and notorious, such that Defendant Darden either was aware or should have been aware of the harassment.

189.   Defendant Darden was explicitly alerted to Defendant Drake's harassment of a female employee in 2016, but failed to appropriately address the complaint.

190.    Defendant Drake was again alerted to Defendant Drake's sexual harassment in or around 2016 via Plaintiff 2's boyfriend's complaint, but ignored the complaint.

191.    Defendant Darden was once again alerted to Defendant Drake's sexual harassment of numerous female employees in 2017, and not only failed to adequately respond to the complaint, but actively sabotaged the resulting investigation, including through providing Defendant Drake with advance notice of the investigation, and by improperly pressuring at least one witness who attested to Defendant Drake's sexual misconduct.

192.    Defendant Drake's harassment of Plaintiff 2 culminated in several tangible adverse employment actions, most notably her termination.

193.    Because Defendant Drake's harassment of Plaintiff 2 culminated in tangible adverse employment actions, Defendant Darden is strictly liable for Defendant Drake's conduct.

194.    In the alternative, Defendant Darden failed to take reasonable steps to prevent harassment in the workplace, as well to ensure that an adequate complaint-reporting system existed, rendering the Company liable for Defendant Drake's conduct.

195.    In the alternative, Defendant Darden was negligent in controlling the working environment that led to Plaintiff 2's harassment, rendering the Company liable for Defendant Drake's conduct.

196.    Through its conduct, Defendant Darden violated Title VII.

197.    Defendant Darden acted with reckless indifference to Plaintiff 2's rights under federal law, warranting an award of punitive damages.

198.    As a result of Defendant Darden's conduct, Plaintiff 2 has suffered, and continues to suffer, emotional distress, humiliation, embarrassment, anguish, personal hardship, career and social disruption, psychological and emotional harm, and lost wages.

## COUNT III

### VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964: *QUID PRO QUO* SEXUAL HARASSMENT (Plaintiff 1 v. Defendant Darden)

199.    Plaintiff 1 hereby incorporates the preceding paragraphs by reference as though fully set forth at length herein.

200.    Plaintiff 1 was an "employee" as defined by 42 U.S.C. § 2000e(f).

201.    Defendant Darden was Plaintiff 2's "employer" within the meaning of 42 U.S.C. §2000e(b), and employed more than 500 persons.

202.    Title VII provides that it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his

36

compensation, terms, conditions, or privileges of employment, because of such

individual's . . . sex . . . ."  42 U.S.C. § 2000e-2(a)(1).

203.   At all times relevant and material herein, Defendant Drake was

employed as the Managing Partner of the Restaurant and served as Plaintiff 1's

supervisor.

204.   At all times relevant and material herein, Defendant Drake possessed

the authority to take tangible employment action against Plaintiff 1, including

hiring, firing, promoting, transferring, and reassigning job responsibilities.

205.   Indeed, Darden characterizes its Managing Partner role as "the most

influential role in [the] company," and Darden's employee handbook provides that

"[s]upervisors are responsible for influencing and taking Company personnel

actions . . . ."

206.   Throughout the course of Plaintiff 1's employment, she was subjected

to unwelcomed sexual advances by Defendant Drake.

207.   Plaintiff 1's continuing employment, promotions, and other

preferential treatment were implicitly conditioned on her submission to Defendant

Drake's advances.

208.   When Plaintiff 1 eventually rejected Defendant Drake's advances,

Defendant Drake: (i) stopped acknowledging Plaintiff 1; (ii) on occasions that he

did acknowledge Plaintiff 1, addressed her as "nubby" in an attempt to degrade

her; (iii) staffed Plaintiff 1 to the lower-paying position of Server notwithstanding her promotion to Service Professional; (iv) took away Plaintiff 1's higher-paying weekend shifts; (v) staffed Plaintiff 1 at a restaurant located more than 50 miles from her home; (vi) ceased all discussions of promoting Plaintiff 1 to a management position; and (vii) ultimately terminated Plaintiff 1 under false pretenses.

209.    Defendant Darden failed to enforce the most basic prohibitions in its own employee handbook seemingly meant to curtail coercive supervisor/employee relationships, including prohibitions against supervisors maintaining friendships with employees, supervisors socializing with employees outside of work, supervisors sending text messages and social media messages to employees, and supervisors drinking alcohol with employees while on-the-clock.

210.    Defendant Drake's harassment of Plaintiff 1 and other female subordinate employees at the restaurant was open and notorious, such that Defendant Darden either was aware or should have been aware of the harassment.

211.    Defendant Darden was explicitly alerted to Defendant Drake's harassment of a female employee in 2016, but failed to appropriately address the complaint.

212.   Defendant Drake was again alerted to Defendant Drake's sexual harassment in or around 2016 via Plaintiff 1's boyfriend's complaint, but ignored the complaint.

213.   Defendant Darden was once again alerted to Defendant Drake's sexual harassment of numerous female employees in 2017, and not only failed to adequately respond to the complaint, but actively sabotaged the resulting investigation, including through providing Defendant Drake with advance notice of the investigation, and by improperly pressuring at least one witness who attested to Defendant Drake's sexual misconduct.

214.   Defendant Drake's harassment of Plaintiff 1 culminated in several tangible adverse employment actions, most notably her termination.

215.   Because Defendant Drake's harassment of Plaintiff 1 culminated in tangible adverse employment actions, Defendant Darden is strictly liable for Defendant Drake's conduct.

216.   In the alternative, Defendant Darden failed to take reasonable steps to prevent harassment in the workplace, as well to ensure that an adequate complaint-reporting system existed, rendering the Company liable for Defendant Drake's conduct.

217.    In the alternative, Defendant Darden was negligent in controlling the working environment that led to Plaintiff 1's harassment, rendering the Company liable for Defendant Drake's conduct.

218.    Through its conduct, Defendant Darden violated Title VII.

219.    Defendant Darden acted with reckless indifference to Plaintiff 1's rights under federal law, warranting an award of punitive damages.

220.    As a result of Defendant Darden's conduct, Plaintiff 1 has suffered, and continues to suffer, emotional distress, humiliation, embarrassment, anguish, personal hardship, career and social disruption, psychological and emotional harm, and lost wages.

## COUNT IV

### VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964: *QUID PRO QUO* SEXUAL HARASSMENT (Plaintiff 2 v. Defendant Darden)

221.    Plaintiff 2 hereby incorporates the preceding paragraphs by reference as though fully set forth at length herein.

222.    Plaintiff 2 was an "employee" as defined by 42 U.S.C. § 2000e(f).

223.    Defendant Darden was Plaintiff 2's "employer" within the meaning of 42 U.S.C. §2000e(b), and employed more than 500 persons.

224.    Title VII provides that it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his

compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(1).

225. At all times relevant and material herein, Defendant Drake was employed as the Managing Partner of the Restaurant and served as Plaintiff 2's supervisor.

226. At all times relevant and material herein, Defendant Drake possessed the authority to take tangible employment action against Plaintiff 2, including hiring, firing, promoting, transferring, and reassigning job responsibilities.

227. Indeed, Darden characterizes its Managing Partner role as "the most influential role in [the] company," and Darden's employee handbook provides that "[s]upervisors are responsible for influencing and taking Company personnel actions . . . ."

228. Throughout the course of Plaintiff 2's employment, she was subjected to unwelcomed sexual advances by Defendant Drake.

229. Plaintiff 2's continuing employment, promotions, and other preferential treatment were implicitly conditioned on her submission to Defendant Drake's advances.

230. When Plaintiff 2 eventually rejected Defendant Drake's advances, Defendant Drake: (i) stopped acknowledging Plaintiff 2; (ii) staffed Plaintiff 2 to the lower-paying position of Server notwithstanding her promotion to Service

Professional; (iii) took away Plaintiff 2's higher-paying weekend shifts; (iv) ceased all discussions of promoting Plaintiff 2 to a management position; (v) became verbally aggressive towards Plaintiff 2; and (vi) ultimately terminated Plaintiff 2 for conduct engaged in by her similarly situated coworkers without being terminated.

231.    Defendant Darden failed to enforce the most basic prohibitions in its own employee handbook seemingly meant to curtail coercive supervisor/employee relationships, including prohibitions against supervisors maintaining friendships with employees, supervisors socializing with employees outside of work, supervisors sending text messages and social media messages to employees, and supervisors drinking alcohol with employees while on-the-clock.

232.    Defendant Drake's harassment of Plaintiff 2 and other female subordinate employees at the restaurant was open and notorious, such that Defendant Darden either was aware or should have been aware of the harassment.

233.    Defendant Darden was explicitly alerted to Defendant Drake's harassment of a female employee in 2016, but failed to appropriately address the complaint.

234.    Defendant Drake was again alerted to Defendant Drake's sexual harassment in or around 2016 via Plaintiff 2's boyfriend's complaint, but ignored the complaint.

235.   Defendant Darden was once again alerted to Defendant Drake's sexual harassment of numerous female employees in 2017, and not only failed to adequately respond to the complaint, but actively sabotaged the resulting investigation, including through providing Defendant Drake with advance notice of the investigation, and by improperly pressuring at least one witness who attested to Defendant Drake's sexual misconduct.

236.   Defendant Drake's harassment of Plaintiff 2 culminated in several tangible adverse employment actions, most notably her termination.

237.   Because Defendant Drake's harassment of Plaintiff 2 culminated in tangible adverse employment actions, Defendant Darden is strictly liable for Defendant Drake's conduct.

238.   In the alternative, Defendant Darden failed to take reasonable steps to prevent harassment in the workplace, as well to ensure that an adequate complaint-reporting system existed, rendering the Company liable for Defendant Drake's conduct.

239.   In the alternative, Defendant Darden was negligent in controlling the working environment that led to Plaintiff 2's harassment, rendering the Company liable for Defendant Drake's conduct.

240.   Through its conduct, Defendant Darden violated Title VII.

241.   Defendant Darden acted with reckless indifference to Plaintiff 2's rights under federal law, warranting an award of punitive damages.

242.   As a result of Defendant Darden's conduct, Plaintiff 2 has suffered, and continues to suffer, emotional distress, humiliation, embarrassment, anguish, personal hardship, career and social disruption, psychological and emotional harm, and lost wages.

## COUNT V

**NEGLIGENT SUPERVISION AND RETENTION**
**(Plaintiff 1 v. Defendant Darden)**

243.   Plaintiff 1 hereby incorporates the preceding paragraphs by reference as though fully set forth at length herein.

244.   Defendant Darden had a duty to ensure that its supervisors did not possess a propensity for episodes of sexually aggressive and/or harassing or reckless behavior.

245.   Defendant Darden had a duty to exercise reasonable care to protect its employees from sexual assaults and/or harassment committed by supervisors who Defendant Darden knew or should have known were likely to engage in sexually aggressive and/or harassing or reckless acts.

246.   Defendant Darden had a duty to ensure that its premises were safe and adequately staffed and supervised.

247. Defendant Darden breached the foregoing duties by, among other things:

      a)     Failing to properly screen Defendant Drake;

      b)     Failing to ensure that Defendant Drake did not possess a propensity for episodes of sexually aggressive and/or harassing or reckless behavior;

      c)     Failing to ensure that Defendant Drake did not possess a propensity to use alcohol on Company premises and during work hours;

      d)     Failing to maintain proper supervision of the Restaurant and Defendant Drake;

      e)     Enabling Defendant Drake, who it knew possessed a propensity for sexually aggressive and/or harassing or reckless behavior, to harm other employees, including Plaintiff 1; and

      f)     Failing to protect Plaintiff 1 from the sexually aggressive and harassing acts of Defendant Drake, which the Company knew or should have known were likely to occur at the Restaurant.

248. Defendant Darden knew, or in the exercise of reasonable care should have known, that Defendant Drake had a propensity to commit sexually aggressive and/or harassing or reckless acts.

249. Indeed, Defendant Drake's sexual misconduct at the Restaurant was open and notorious and was directed towards numerous female subordinate employees, and at least three complaints were lodged with Defendant Darden concerning Defendant Drake's mistreatment of female employees.

250. Nevertheless, Defendant Darden retained Defendant Drake, and failed to adequately supervise him, even after it possessed actual knowledge of his sexually aggressive and/or harassing or reckless behavior.

251. The above-described assaults against Plaintiff 1 were committed while Defendant Drake was acting outside the course and scope of his employment with Defendant Darden.

252. The above-described assaults against Plaintiff 1 occurred upon premises that Defendant Drake was privileged to enter only as a servant to Defendant Darden.

253. By retaining and failing to adequately supervise Defendant Drake, Defendant Darden created a situation where Defendant Drake's sexually aggressive tendencies could harm other employees, including Plaintiff 1.

254. By retaining and failing to adequately supervise Defendant Drake, Defendant Darden acted in conscious disregard of, or with reckless indifference to, the known and obvious risk that Defendant Drake posed to the Company's employees, including Plaintiff 1, warranting an award of punitive damages.

255.    As a direct result of the negligence, carelessness, and recklessness of Defendant Darden, Plaintiff 1 has been harmed.

256.    The harm to Plaintiff 1 was reasonably foreseeable to Defendant Darden.

257.    All of Plaintiff 1's losses and damages were, are, and will be due solely to and by reason of the carelessness, negligence, and recklessness of Defendant Darden, without any negligence or want of due care on Plaintiff 1's part contributing thereto.

## COUNT VI

### NEGLIGENT SUPERVISION AND RETENTION
### (Plaintiff 2 v. Defendant Darden)

258.    Plaintiff 2 hereby incorporates the preceding paragraphs by reference as though fully set forth at length herein.

259.    Defendant Darden had a duty to ensure that its supervisors did not possess a propensity for episodes of sexually aggressive and/or harassing or reckless behavior.

260.    Defendant Darden had a duty to exercise reasonable care to protect its employees from sexual assaults and/or harassment committed by supervisors who Defendant Darden knew or should have known were likely to engage in sexually aggressive and/or harassing or reckless acts.

261. Defendant Darden had a duty to ensure that its premises were safe and adequately staffed and supervised.

262. Defendant Darden breached the foregoing duties by, among other things:

a) Failing to properly screen Defendant Drake;

b) Failing to ensure that Defendant Drake did not possess a propensity for episodes of sexually aggressive and/or harassing or reckless behavior;

c) Failing to ensure that Defendant Drake did not possess a propensity to use alcohol on Company premises and during work hours;

d) Failing to maintain proper supervision of the Restaurant and Defendant Drake;

e) Enabling Defendant Drake, who it knew possessed a propensity for sexually aggressive and/or harassing or reckless behavior, to harm other employees, including Plaintiff 2; and

f) Failing to protect Plaintiff 2 from the sexually aggressive and harassing acts of Defendant Drake, which the Company knew or should have known were likely to occur at the Restaurant.

263.   Defendant Darden knew, or in the exercise of reasonable care should have known, that Defendant Drake had a propensity to commit sexually aggressive and/or harassing or reckless acts.

264.   Indeed, Defendant Drake's sexual misconduct at the Restaurant was open and notorious and was directed towards numerous female subordinate employees, and at least three complaints were lodged with Defendant Darden concerning Defendant Drake's mistreatment of female employees.

265.   Nevertheless, Defendant Darden retained Defendant Drake, and failed to adequately supervise him, even after it possessed actual knowledge of his sexually aggressive and/or harassing or reckless behavior.

266.   The above-described assaults against Plaintiff 2 were committed while Defendant Drake was acting outside the course and scope of his employment with Defendant Darden.

267.   The above-described assaults against Plaintiff 2 occurred upon premises that Defendant Drake was privileged to enter only as a servant to Defendant Darden.

268.   By retaining and failing to adequately supervise Defendant Drake, Defendant Darden created a situation where Defendant Drake's sexually aggressive tendencies could harm other employees, including Plaintiff 2.

269. By retaining and failing to adequately supervise Defendant Drake, Defendant Darden acted in conscious disregard of, or with reckless indifference to, the known and obvious risk that Defendant Drake posed to the Company's employees, including Plaintiff 2, warranting an award of punitive damages.

270. As a direct result of the negligence, carelessness, and recklessness of Defendant Darden, Plaintiff 2 has been harmed.

271. The harm to Plaintiff 2 was reasonably foreseeable to Defendant Darden.

272. All of Plaintiff 2's losses and damages were, are, and will be due solely to and by reason of the carelessness, negligence, and recklessness of Defendant Darden, without any negligence or want of due care on Plaintiff 2's part contributing thereto.

## **COUNT VII**

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**(Plaintiff 1 v. Defendant Drake)**

273. Plaintiff 1 hereby incorporates the preceding paragraphs by reference as though fully set forth at length herein.

274. Defendant Drake subjected Plaintiff 1 to a years-long campaign of unwanted and escalating sexual advances, sexually assaulted her, and terminated

her from her longtime career with Defendant Darden when she rebuffed his continuing advances.

275.   Defendant Drake either intended to cause Plaintiff 1 severe emotional distress, or was reckless in not knowing that his conduct would cause Plaintiff 1 severe emotional distress.

276.   As a result of Defendant Drake's conduct, Plaintiff 1 suffered, and continues to suffer, severe emotional distress.

277.   The conduct engaged in by Defendant Drake constitutes reckless indifference to the rights of Plaintiff 1 sufficient to subject Defendant Drake to punitive damages.

## COUNT VIII

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Plaintiff 2 v. Defendant Drake)

278.   Plaintiff 2 hereby incorporates the preceding paragraphs by reference as though fully set forth at length herein.

279.   Defendant Drake subjected Plaintiff 2 to a years-long campaign of unwanted and escalating sexual advances, and terminated Plaintiff 2 from her longtime career with Defendant Darden when she rebuffed his continuing advances.

280.   Defendant Drake either intended to cause Plaintiff 2 severe emotional distress, or was reckless in not knowing that his conduct would cause Plaintiff 2 severe emotional distress.

281.   As a result of Defendant Drake's conduct, Plaintiff 2 suffered, and continues to suffer, severe emotional distress.

282.   The conduct engaged in by Defendant Drake constitutes reckless indifference to the rights of Plaintiff 2 sufficient to subject Defendant Drake to punitive damages.

## COUNT IX

### ASSAULT AND BATTERY
### (Plaintiff 1 v. Defendant Drake)

283.   Plaintiff 1 hereby incorporates the preceding paragraphs by reference as though fully set forth at length herein.

284.   On multiple occasions, Defendant Drake intended and did attempt to cause offensive bodily contact to Plaintiff 1.

285.   Defendant Drake's attempt to cause offensive bodily contact to Plaintiff 1 was successful, as he did in fact cause offensive bodily contact to Plaintiff 1.

286.   As a result of Defendant Drake's conduct, Plaintiff 1 has been harmed.

287.   The conduct engaged in by Defendant Drake constitutes reckless indifference to the rights of Plaintiff 1 sufficient to subject Defendant Drake to punitive damages.

## COUNT X

### ASSAULT AND BATTERY
### (Plaintiff 2 v. Defendant Drake)

288.   Plaintiff 2 hereby incorporates the preceding paragraphs by reference as though fully set forth at length herein.

289.   On multiple occasions, Defendant Drake intended and did attempt to cause offensive bodily contact to Plaintiff 2.

290.   Defendant Drake's attempt to cause offensive bodily contact to Plaintiff 2 was successful, as he did in fact cause offensive bodily contact to Plaintiff 2.

291.   The conduct engaged in by Defendant Drake constitutes reckless indifference to the rights of Plaintiff 2 sufficient to subject Defendant Drake to punitive damages.

### Prayer for Relief

**WHEREFORE**, Plaintiffs pray that a judgment be entered in their favor and against Defendants in the following respects:

a) An order awarding back pay, front pay, compensatory damages, and punitive damages on Counts I, II, III, and IV;

b) An order awarding compensatory and punitive damages on Counts V, VI, VII, VIII, IX, and X;

c) An order awarding attorneys' fees and expenses on Counts I, II, III, and IV pursuant to 42 U.S.C. § 2000e-5(k);

d) Pre-judgment and post-judgment interest; and

e) All other relief as the Court deems just and equitable.

### Jury Demand

Plaintiffs demand a jury trial on all issues so triable.

Respectfully submitted,

**Mobilio Wood**

Date: _5/28/2020_     BY:  *s/ Peter C. Wood, Jr.*
                                Peter C. Wood, Jr., Esq. (I.D. No. 310145)
                                900 Rutter Ave., Box 24
                                Forty Fort, PA 18704
                                Phone: (570) 234-0442
                                Fax: (570) 266-5402
                                peter@mobiliowood.com

Matthew Mobilio, Esq. (I.D. No. 209439)
609 W. Hamilton St., Suite 301
Allentown, PA 18101
Phone: (610) 882-4000
Fax: (866) 793-7665
matt@mobiliowood.com